**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff,<br>v.<br>**APPROXIMATELY 927,155.442 USDT,**<br>Defendant. | Case No. 25-cv-3914 (CRC) |

**OPINION**

In this *in rem* civil forfeiture action, the government has moved for default judgment and seeks a final order of forfeiture against all persons claiming an interest in digital currency worth $ 927,155.442 USD, which was recovered through the FBI's investigation of an international cryptocurrency investment fraud ("CIF") scheme colorfully referred to as "pig-butchering." Compl. ¶ 30. Despite its crypto angle, the scheme is a classic con job: Criminals contact potential victims online, seeking to build rapport and often romantic relationships. Id. ¶ 31. Once trust has been established, the perpetrator suggests that the victim make a virtual currency investment, typically through a fake online investment platform. Id. ¶ 32. After the victim makes initial deposits, the platform may show lucrative returns, thereby encouraging further investment—or the perpetrator may promise to make "investments" of their own alongside the victim's. Id. Ultimately, of course, the deposited funds are routed to a virtual currency address controlled by the perpetrator, and the victim is unable to recover them. Id.

The government has satisfied both the standard for default judgment and the requirements enumerated in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. Accordingly, the Court will grant its motion for default judgment and issue a final order of forfeiture.

## I. Background

Since 2023, the FBI has been investigating a complex cryptocurrency fraud scheme that has fleeced over a dozen victims out of a total of over $14 million. Compl. ¶ 1. This particular shakedown begins with R.M., who connected with a young woman named "Anna Wang" on Facebook in the summer of 2023. Id. ¶ 35. The two began what R.M. thought was a romantic relationship. Wang claimed to live in New York City with an aunt who was a cryptocurrency investment expert with Goldman Sachs. Id. ¶ 36. She persuaded R.M. to invest through her aunt's purported cryptocurrency platform, promising outsized returns. Id. ¶ 37. R.M. deposited funds on the platform, and over time, Wang upped the ante, encouraging R.M. to invest more to improve his returns and gain Wang's aunt's approval for their relationship. Id. ¶ 37. Wang also claimed that she was investing her own funds in the platform. Id. Eventually, though, R.M. discovered that he had been locked out of his account and was unable to withdraw his now-sizeable investment. Id. ¶ 39. It was around this time that the FBI contacted him to apprise him of the CIF scheme to which he had fallen prey. Id. ¶ 40.

By the fall of that year, FBI special agents and forensic accountants began to trace R.M.'s funds through blockchain analysis. Id. ¶ 42. As is common in crypto-fraud schemes, his deposits were comingled with other funds and split along different laundering paths to conceal the precise location of the stolen amount. Id. ¶ 43. Through its forensic analysis, the FBI identified a set of common cryptocurrency wallet addresses that had been used to defraud several *other* victims in roughly the same fashion as R.M. Id. ¶ 47. Each victim met an individual on Facebook, LinkedIn, a dating portal, or other social media website, who directed them to invest large sums of money on a fake cryptocurrency platform. When the victim eventually grew suspicious about the authenticity of the platform and tried to withdraw their deposits, they—like

R.M.—discovered that their account had been frozen. See generally id. ¶¶ 49–62. Most were left high and dry, unable to recover the money they had sunk into the scheme. Id. ¶ 63.

Meanwhile, the perpetrators channeled victims' "investments" through multiple virtual currency addresses and eventually swapped them into Tether USD ("USDT"), a form of digital currency pegged to the U.S. dollar. Id. ¶ 43. A total of 927,155.442 USDT in stolen funds ("Defendant Property") was ultimately laundered into five "subject addresses" housed on Tether Ltd., the company that manages the "treasury" for USDT crypto tokens. Id. ¶¶ 42, 28. In December 2023, pursuant to a law enforcement request, Tether froze the subject addresses and their balances. Id. ¶¶ 42, 86. Following that freeze, a few individuals contacted Tether to claim ownership over the funds held within two of the subject addresses. Id. ¶ 86. But when FBI investigators started to probe the identity of these individuals, they clammed up. Id. ¶¶ 87–91.

On November 13, 2025, the government filed a verified complaint for forfeiture of the frozen funds, explaining that the Defendant Property should be turned over to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), as the property constituted the proceeds of a wire fraud and international money laundering scheme. Pursuant to Supplemental Rule G(4)(a), the government posted a notice of forfeiture on its official website for at least 30 consecutive days in early 2026. See Decl. of Publ'n, ECF No. 2-1 at 4. No party filed any claim based on the notice of publication. The government represents that it has found no person who reasonably appears to be a potential claimant in this case. Mot. for Default J. ¶ 2; see also Resp. to Order of Court, ECF No. 9 ¶ 3. And it states that no other party has filed a claim to the Defendant Property in any other fashion. Mot. for Default J. ¶ 3. The Clerk of Court entered default as to all potentially interested parties in May. See Clerk's Entry of Def., ECF No. 5.

The government now moves for default judgment, seeking a final order of forfeiture. On August 7, 2026, it followed up with an emergency motion for the forfeiture of property, explaining that a "victim traceable to the Defendant Property faces imminent foreclosure of their home," and the "United States intends to compensate this victim with funds from the Defendant Property but cannot until there is an order granting forfeiture to the United States." Emerg'y Mot. ¶¶ 1–2. After the Court requested clarification as to Plaintiff's compliance with certain elements of Supplemental Rule G, see Aug. 10, 2026 Min. Order, the Plaintiff requested the issuance of an arrest warrant for Defendant Property, which the Clerk of Court granted, see Warrant, ECF No. 11 at 1–2. Defendant Property is in the government's possession, custody, and control. See Compl. ¶ 16; Resp. to Order of Court, ECF No. 9 ¶ 2.

## II. Legal Standard

Obtaining default judgment is a two-step process. See Boland v. Cacper Const. Corp., 130 F. Supp. 3d 379, 382 (D.D.C. 2015). First, a plaintiff must request that the Clerk of the Court enter default against a party who has "failed to plead or otherwise defend" against the action. Fed. R. Civ. P. 55(a). Then, the plaintiff "must apply to the court for a default judgment." Fed. R. Civ. P 55(b)(2). "Whether default judgment is appropriate is in the discretion of the trial court." Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Vistacare LLC, 819 F. Supp. 3d 1, 10 (D.D.C. 2026) (citations omitted). "Upon entry of default by the clerk," each "well-pleaded allegation in the complaint" is deemed admitted. Id. (cleaned up). "[T]he defendant's default notwithstanding, the plaintiff is entitled to a default judgment only if the complaint states a claim for relief." Jackson v. Corr. Corp. of Am., 564 F. Supp. 2d 22, 27 (D.D.C. 2008).

## III. Analysis

A. Notice

"Before a default judgment is entered pursuant to a complaint for forfeiture *in rem*, the government must show that it complied with the notice requirements contained in the Supplemental Rules." United States v. $1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd., 324 F. Supp. 3d 38, 45 (D.D.C. 2018). "Supplemental Rule G(4) requires the government to provide two forms of notice in an [*in rem*] forfeiture action": "notice to the public via publication and notice to potential claimants via direct notice." United States v. Twenty-Four Cryptocurrency Accts., 473 F. Supp. 3d 1, 5 (D.D.C. 2020).

The government has satisfied both requirements here. *First*, it "published notice of the action within a reasonable time after filing the complaint," Fed. R. Civ. P. Supp. R. G(4)(a)(i), "on an official internet government forfeiture site for at least 30 consecutive days," id. at G(4)(a)(iii)(B), (iv)(C). That notice properly "describe[d] the property, state[d] the time to file a claim and answer, and name[d] the government attorney to be served with the claim and answer." Twenty-Four Cryptocurrency Accts., 473 F. Supp. 3d at 5 (citing Fed. R. Civ. P. Supp. R. G(4)(a)(ii)). And *second*, the government has represented that there are no known potential claimants for Defendant Property here. See Mot. for Default J. ¶ 2. Although some individuals apparently reached out to Tether to claim ownership over funds held in two of the five subject addresses holding Defendant Property, Compl. ¶ 86, they cut off contact after investigators probed for any identifying information, id. ¶¶ 87–91. Because none of these individuals "provided credible proof of ownership" over any portion of Defendant Property, the government has therefore concluded that "there is no person who reasonably appears to be a potential claimant in this case." See also Resp. to Order of Court, ECF No. 9 ¶ 3. Based on the available

representations, the Court agrees and concludes that both of Supplemental Rule G's notice requirements are satisfied here.

B. Adequacy of the Complaint

Supplemental Rule G further sets forth the pleading requirements for an *in rem* civil forfeiture action. The government must file a verified complaint that states the grounds for jurisdiction and venue, "describe[s] the property with reasonable particularity," "identif[ies] the statute under which the forfeiture action is brought," and "state[s] sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Fed. R. Civ. P. Supp. R. G(2)(a)–(f). This is not an "onerous standard," but rather sets a "low bar" appropriate at the default judgment phase "where a court should exercise greater flexibility in judging factual allegations." Mingzheng Int'l Trading Ltd., 324 F. Supp. 3d at 51–52.

The verified complaint in this case meets this "low bar." It states the appropriate bases for jurisdiction and venue, Compl. ¶¶ 3–5, and describes the Defendant Property in reasonable detail, including by specific reference to its subject addresses, id. ¶ 15. The complaint further identifies the statutes under which the action is brought, see id. ¶¶ 6–14, including 18 U.S.C. § 981(a)(1), which mandates forfeiture of property involved in wire fraud and money laundering.

Finally, the complaint states sufficiently detailed facts to support a belief that the government could meet its burden of proof (here, a preponderance of the evidence) if this case were to go to trial. United States v. Sum of $ 70,990,605, 4 Supp. 3d 189, 197 (D.D.C. 2014). The government alleges that Defendant Property was obtained through CIF schemes that targeted several individuals through various social networking and social media websites. See generally id. ¶¶ 30–85. According to the complaint, the fraud and money laundering in this case follows a familiar pattern of "pig butchering." The named victims were deceived into thinking that they

had developed a relationship of trust or romance with the perpetrator, who then encouraged them to invest in a fake cryptocurrency platform. Id. ¶¶ 35–38, 49–62. When the perpetrator reported that the initial investment generated a "return," the victims continued to invest, whether because they understood the platform to be a genuine money-making opportunity or because they wished to develop their relationship with the perpetrator. Id. And across the board, the victims were eventually locked out of the fake platform or otherwise prevented from retrieving their funds, leading to a collective loss of millions of dollars. Id. ¶¶ 38–41, 49–63. The stolen funds were then comingled and laundered through numerous cryptocurrency wallets within a matter of days, id. ¶ 73, "essentially scattering" the sums "on the blockchain" to conceal their location. Id. ¶ 43.

In short, the "pig butchering" scheme detailed in the government's complaint defrauded a slew of victims and then attempted to wash the stolen funds by passing them through a series of intermediary crypto wallets. The allegations support a reasonable belief that the government would be able to prove by a preponderance of the evidence that Defendant Property is traceable to wire fraud and money laundering, rendering it forfeitable under 18 U.S.C. § 981(a)(1).

## IV. Conclusion

Because the verified complaint states a claim for forfeiture *in rem* under Supplemental Rule G, the government has complied with the requisite procedural requirements (including adequate noticed), and no claimant has appeared to challenge the forfeiture, the Court will grant the government's motion for default judgment. A separate Order shall accompany this Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: August 21, 2026